UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**RODNEY THORNTON**                                            **CIVIL ACTION**

**VERSUS**                                                     **NO. 20-249**

**JAMES LEBLANC, ET AL.**                                      **SECTION: "D"(1)**

**REPORT AND RECOMMENDATION**

Plaintiff, Rodney Thornton, a state prisoner incarcerated at the Rayburn Correctional Center ("RCC"), filed this *pro se* federal civil action pursuant to 42 U.S.C. § 1983. He sued James LeBlanc, Robert Tanner, Cecilia Light, Augustine Brathwaite,[1] Angela Sincere, Yolanda Walker, and Angela Butler. In the complaint, plaintiff claims that the defendants are prohibiting him from receiving publications in violation of his rights guaranteed by the First and Fourteenth Amendments.[2] The only relief he requests is that "he, and other offenders housed in segregation, be allowed to receive books, magazines, newspapers, brochures, flyers, and/or catalogs like the rest of the offenders housed in the compound."[3]

**I.   Standards of Review**

Plaintiff filed this federal civil action *in forma pauperis*. Concerning such actions, federal law provides:

> Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action …

---

[1] This defendant's surname is spelled various ways in the complaint; however, the jail records attached show that the correct spelling is "Brathwaite." See Rec. Doc. 1-2, p. 11.
[2] Rec. Doc. 1, p. 13.
[3] Id. at p. 17.

>       (i)    is frivolous or malicious;
>       (ii)   fails to state a claim on which relief may be granted; or
>       (iii)  seeks monetary relief against a defendant who is immune from such relief.

28 U.S.C. § 1915(e)(2)(B).

In addition, because plaintiff is incarcerated, he is also subject to the screening provisions of 28 U.S.C. § 1915A. That statute mandates that federal courts "review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a). Regarding such lawsuits, federal law similarly requires:

> On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint –
>
>       (1)    is frivolous, malicious, or fails to state a claim upon which relief may be granted; or
>       (2)    seeks monetary relief from a defendant who is immune from such relief.

28 U.S.C. § 1915A(b).

A complaint is frivolous "if it lacks an arguable basis in law or fact." Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994). In determining whether a claim is frivolous, the Court has "not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." Neitzke v. Williams, 490 U.S. 319, 327 (1989); Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994).

A complaint fails to state a claim on which relief may be granted when the plaintiff does not "plead enough facts to state a claim to relief that is plausible on its face. Factual allegations

must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." In re Katrina Canal Breaches Litigation, 495 F.3d 191, 205 (5th Cir. 2007) (citation, footnote, and quotation marks omitted). The United States Supreme Court has held:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations and quotation marks omitted).

## II. Plaintiff's Allegations

In his complaint, plaintiff alleges:

> On 5/10/19, 6/1/19, and 6/2/19 – and subsequently on 10/25/19, 11/01/19, 11/19/19, and 1/8/20 – Plaintiff received notices of publication rejections from the RCC Mail Room, from CSM Augustine Brathwait, CSM Angela Sincere, Sgt. Cecilia Light, Sgt. Yolanda Walker, and Sgt. Angela Butler, all assigned to the RCC Mailroom at the time of their rejections. The rejected publications were: (1) Gospel Express Ministries 5/10/19; (2) Girls and Mags Periodical, 6/1/19; and (3) Keep the Fire Burning – A publication by and for California Prisoners Periodical, 6/2/19; (4) Critical Resistance Publishing, 10/25/19; (5) Center for Constitutional Rights 11/01/19; (6) Prisoner Reentry Institute; and most recently (7) a confiscation notice that does not list the confiscated publication nor its sender. **(Exhibit D)**
> The rejection notices do not state any specific reason for the rejections other than "Offender is housed in Sun Unit" (Level II Segregation Unit), "Per USOPP #34 Maximum Security offenders are not allowed to receive periodicals or packages," "You are not allowed to receive periodicals or packages in your current housing," or similar broad, generic responses. Plaintiff adds that he is also prohibited from receiving information from the State Library and receiving other publications defined as books, magazines, newspapers, or other materials such as advertising brochures, flyers, and catalogs.
> Plaintiff recognizes that the right to receive publications may be restricted by further provisions governing the administration of prisons, which authorize the warden to reject a publication if it is determined to be detrimental to the security, good order, or discipline of the institution or if it might facilitate any criminal

activity. However, he states that officials cannot contain a list of criteria that may support rejection of a publication simply for being housed in Segregation (Sun Unit Extended Level 2/Working Cellblock or Sleet Unit Extended Lockdown Level 1, at Rayburn Correctional Center). Being in segregation is not a legitimate reason to prohibit offenders from receiving publications.

Plaintiff received rejection notices just because he is housed in Administrative Segregation.

Plaintiff avers that constitutional protections require prisons to follow certain procedures to ban a publication. A prison cannot maintain a list of excluded publications or decide that no materials from a particular organization will be allowed in without a clearly stated reason. It must decide on each book, magazine, or publication on a case-by-case basis. This is true even if a prison official already knows that the books or magazines come from an organization they do not approve of.

Plaintiff further states that prison officials cannot censor material just because it contains religious, philosophical, political, social, sexual, or unpopular content. They can only censor material if they believe it may cause disorder or violence, or will hurt a prisoner's rehabilitation. This means, for example, that a prison cannot ban access to materials targeted to an African-American audience, which already happened at RCC, when urban fiction novels were banned, which the majority of African-Americans read. In their reasoning, administration officials state that offenders are not supposed to receive any books on gangs or racism, but there are books on Hell's Angels, a ruthless biker gang, or books on Charles Manson, a white supremacist, among other titles.

In addition, the Department of Corrections' Rejection List, Updated August 2019, from Department Regulation C-01-009, *Offender mail and publications*, does not state that offenders are not allowed to receive information from the State Library such as information on reptiles and amphibians, biographies/ autobiographies on sports celebrities, and other themes, which Petitioner has requested in the past. Petitioner avers that he should not be denied receiving or requesting such information from a state source.[4]

Plaintiff attached to his complaint copies of the administrative grievance he filed with respect to this dispute and the responses thereto. In denying the grievance, RCC Warden Robert Tanner stated:

> Your complaint has been reviewed and investigated. The Mailroom Legal Mail Receipt Log and Publication Notice of Rejections have also been reviewed.

---

[4] Rec. Doc. 1, pp. 11-13.

> You make reference to three specific packages/periodicasl [sic]. The first (Gospel Express Ministries) was received in the Mailroom on May 10, 2019. You received a Publications Notice of Rejection on May 11, 2019. On the notice you were advised that RCC Directive #5.4.2., does not permit offenders in Preventative Segregation to receive packages or periodicals. You were also given instructions to submit a Withdrawal Form with an address for postage to have the item mailed out, or have a visitor pick up the item, or have the item donated. You were also informed on this notice that you had 21 days to comply with these instructions or the items would be disposed in accordance with policy. You did not send the Mailroom any instructions as to your wishes so the property was disposed of on June 3, 2019.
>
> The second package/periodical referenced by you (Girls and Mags) was received in the Mailroom on June 1, 2019. This package/periodical was marked "Return to Sender" by Mailroom staff and returned to the United States Post Office. You received a Publications Notice of Rejection on June 2, 2019, explaining that in accordance with Unit Specific Offender Posted Policy (USOPP) #34 offenders in Preventative Segregation may not receive packages or periodicals. You were informed on this notice that the publication had been returned.
>
> The third package periodical referenced by you (Keep the Fires Burning – A publication by and for California Prisoners) was received in the Mailroom on June 2, 2019. This package/periodical was marked "Return to Sender" by Mailroom staff and returned to the United States Post Office. You received a Publications Notice of Rejection on June 2, 2019. You were advised once again that USOPP #34 prohibits the possessions of packages or periodicals by offenders in Preventative Segregation. You were also informed on this notice that the publication had been returned.
>
> Offender housed in Preventative Segregation may correspond and received correspondence. However, the actions taken by the Mailroom staff was in accordance with USOPP #34, Maximum Custody Housing, Item 15, Offenders housed in maximum custody cannot receive packages or periodicals. Packages are any items except letters that come through the mails and periodicals include magazines, newspapers, or other literature type material received through the mail.
>
> No relief is warranted for this complaint.[5]

Plaintiff appealed to the Secretary of the Louisiana Department of Public Health and Safety, and his grievance was again denied at that level of review:

---

[5] Rec. Doc. 1-2, p. 6.

> Your request for an Administrative review of ARP# RCC-2019-534 has been received. A qualified member of the Headquarters staff has reviewed your request to render a fair and impartial response.
>
> Your allegations have been considered. The response provided is clear and concise, as well as has addressed your request appropriately. You claim that your Constitutional Rights were violated when the mailroom rejected periodicals/magazines sent to you while you were housed in Preventative Segregation has no merit. You have failed to provide any evidence to substantiate said allegation or that would cause us to believe otherwise. As such, this office concurs with staff and finds no further investigation warranted.
>
> Your request for relief is denied.[6]

### III. Plaintiff's Claims

As noted, plaintiff claims that his rights under the First and Fourteenth Amendments are being violated as a result of an RCC policy prohibiting inmates confined in segregation units from receiving published materials. However, even after broadly construing plaintiff's complaint,[7] the undersigned finds that his claims should be dismissed as frivolous and/or for failing to state a claim upon which relief may be granted for the following reasons.

The RCC policy which prohibits inmates in administrative segregation from receiving publications has previously been determined by the courts to be constitutional. See, e.g., Wright v. Tanner, Civ. Action No. 19-10652, 2019 WL 7584327 (E.D. La. Dec. 2, 2019), adopted, 2020 WL 224968 (E.D. La. Jan. 15, 2020); Tyson v. LeBlanc, Civ. Action No. 10-1174, 2010 WL 5375955 (E.D. La. Nov. 19, 2010), adopted, 2010 WL 5376330 (E.D. La. Dec. 15, 2010), aff'd, 431 F. App'x 371 (5th Cir. 2011). The same result should be reached in this case for the following reasons.

---

[6] Id. at p. 9.
[7] The Court must liberally construe a *pro se* civil rights complaint. See Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994).

6

As to plaintiff's First Amendment claims, the challenged policy potentially implicates two rights protected by the First Amendment: (1) the right to receive information through the mail;[8] and (2) the right to the free exercise of religion.[9]

As to the right to receive information, that aspect of plaintiff's challenge is effectively foreclosed by Beard v. Banks, 548 U.S. 521 (2006). In Beard, the Supreme Court "consider[ed] whether a Pennsylvania prison policy that denie[d] newspapers, magazines, and photographs to a group of specially dangerous and recalcitrant inmates violate[d] the First Amendment." Beard, 548 U.S. at 524-25 (quotation marks omitted). In a plurality opinion, Justice Breyer found that the policy was constitutional.

Justice Breyer first observed:

> Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and Overton v. Bazzetta, 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003), contain the basic substantive legal standards governing this case. This Court recognized in Turner that imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those of the First Amendment. 482 U.S., at 93, 107 S.Ct. 2254; see also O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). But at the same time the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere. See, *e.g.,* Turner, *supra*, at 84-85, 107 S.Ct. 2254. As Overton (summarizing pre-Turner case law) pointed out, courts owe "substantial deference to the professional judgment of prison administrators." 539 U.S., at 132, 123 S.Ct. 2162. And Turner reconciled these principles by holding that restrictive prison regulations are permissible if they are "'reasonably related' to legitimate penological interests," 482 U.S., at 87, 107 S.Ct. 2254, and are not an "'exaggerated response'" to such objectives, ibid.

---

[8] See, e.g., Frazier v. Ortiz, 417 F. App'x 768, 773 (10th Cir. 2011) ("The First Amendment protects a prisoner's right to receive mail."); Jackson v. Pollard, 208 F. App'x 457, 460 (7th Cir. 2006) ("Inmates retain a First Amendment right to receive information through the mail...."). Although plaintiff refers in his complaint to his right to "freedom of speech," the policy does not in any way affect his right to express his own views; therefore, under a liberal construction of the complaint, the Court assumes that plaintiff is instead alleging that his First Amendment right to *receive* information from others is being infringed.

[9] See, e.g., Butts v. Martin, 877 F.3d 571, 584 (5th Cir. 2017) ("Lawful incarceration inherently involves the limitation of many privileges and rights, but prisoners still benefit from some constitutional protections, including the First Amendment directive that no law shall prohibit the free exercise of religion." (quotation marks omitted)).

>Turner also sets forth four factors "relevant in determining the reasonableness of the regulation at issue." Id., at 89, 107 S.Ct. 2254. First, is there a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"? Ibid. Second, are there "alternative means of exercising the right that remain open to prison inmates"? Id., at 90, 107 S.Ct. 2254. Third, what "impact" will "accommodation of the asserted constitutional right ... have on guards and other inmates, and on the allocation of prison resources generally"? Ibid. And, fourth, are "ready alternatives" for furthering the governmental interest available? Ibid.

Beard, 548 U.S. at 528-29.

Regarding the first factor, Justice Breyer noted that one of the "penological rationales" for the challenged policy was to motivate "particularly difficult prisoners" to exhibit better behavior. Finding that the evidence showed that the policy did in fact serve that function, Justice Breyer concluded: "The articulated connections between newspapers and magazines, the deprivation of virtually the last privilege left to an inmate, and a significant incentive to improve behavior, are logical ones. Thus, the first factor supports the Policy's 'reasonableness.'" Id. at 531-32.

Regarding the second factor, Justice Breyer found that no "alternative means of exercising the right" remained open to the prisoners, but he noted: "The absence of any alternative thus provides some evidence that the regulations are unreasonable, but is not conclusive of the reasonableness of the Policy." Id. at 532 (quotation marks and brackets omitted).

Regarding the third factor, Justice Breyer found:

>[W]ere prison authorities to seek to accommodate the asserted constitutional right, the resulting impact would be negative. That circumstance is also inherent in the nature of the Policy: If the Policy (in the authorities' view) helps to produce better behavior, then its absence (in the authorities' view) will help to produce worse behavior, *e.g.,* "backsliding" ….

Id. (citation, quotation marks, brackets, and ellipsis omitted).

Regarding the fourth factor, Justice Breyer found that there was no evidence of an "alternative method of accommodating the claimant's constitutional complaint that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." Id. (ellipsis omitted).

Justice Breyer then concluded:

> The real task in this case is not balancing these factors, but rather determining whether the Secretary shows more than simply a logical relation, that is, whether he shows a *reasonable* relation. We believe the material presented here by the prison officials is sufficient to demonstrate that the Policy is a reasonable one.

Id. at 533.[10]

When the RCC policy at issue herein was previously challenged, United States Magistrate Judge Joseph C. Wilkinson, Jr., issued a Report and Recommendation in which he concluded that the policy was constitutional. He observed:

> Inmates in Extended Lockdown Level 1 are prohibited from possessing photographs, television, newspapers, magazines and radios. Prisoners in Extended Lockdown Level 2 may have photographs and limited access to television. Inmates in the working cell block may also have a "walk-man" type of radio or CD player. Thus, possession of photographs, newspapers, magazines and radios and access to television are privileges, which must be earned and are awarded to prisoners who do not have major disciplinary problems. Withdrawal of privileges is intended to encourage better behavior on the part of inmates, like [plaintiff], who have extensive disciplinary conduct records. Inmates in Extended Lockdown Level 1 have few other privileges to lose.
> The evidence establishes that the challenged regulations are reasonably related to legitimate penological interests. Valid, rational connections exist between the prison regulations that restrict the access of inmates in Extended Lockdown Level 1, including [plaintiff], to reading materials, radio and television and the legitimate governmental interests that defendants have put forward to justify the regulations. Defendants have asserted reasons of safety, security, punishment for bad behavior and the reward of privileges for improved behavior.

---

[10] Justice Beyer's opinion was joined by Chief Justice Roberts and Justices Kennedy and Souter. Justices Thomas and Scalia concurred only in the judgment of the Court, rejecting the analysis of the plurality opinion. Justices Stevens and Ginsburg dissented, and Justice Alito took no part in the consideration or decision of the case.

Tyson v. LeBlanc, Civ. Action No. 10-1174, 2010 WL 5375955, at *11-12 (E.D. La. Nov. 19, 2010). Magistrate Judge Wilkinson then went on to conclude: "The Supreme Court held in Beard in 2006 that the specific conduct of which [plaintiff] complains, based on the same legitimate penological purposes that defendants have asserted here and in similar factual circumstances, did *not* violate the First Amendment. That opinion has not been overruled or called into question by either the Supreme Court or the Fifth Circuit." Id. at *14. United States District Judge Helen G. Berrigan thereafter adopted Magistrate Judge Wilkinson's recommendation that the challenge to the policy be dismissed. Tyson v. LeBlanc, Civ. Action No. 10-1174, 2010 WL 5376330 (E.D. La. Dec. 15, 2010). The United States Fifth Circuit Court of Appeals then affirmed that decision. Tyson v. LeBlanc, 431 F. App'x 371 (5th Cir. 2011) ("With respect to his claim regarding restrictions on inmate purchases of reading materials and radios, his attempt to distinguish Beard v. Banks, 548 U.S. 521, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006), is unavailing, and he has, therefore, failed to show the district court erred in granting summary judgment in favor of the defendants on this claim.").

Based on Beard and Tyson, the policy was again found not to violate RCC inmates' right to receive information in Wright v. Tanner, Civ. Action No. 19-10652, 2019 WL 7584327 (E.D. La. Dec. 2, 2019), adopted, 2020 WL 224968 (E.D. La. Jan. 15, 2020). The same conclusion is appropriate in this case for the reasons noted in Beard, Tyson, and Wright.

Next, as to plaintiff's separate and distinct claim that the policy violates his First Amendment right to the free exercise of religion, the Court in Wright likewise found that the challenged policy did not violate that right. Although noting that Beard and Tyson were not

directly applicable because those cases involved no such claim,[11] the Court observed that the very same Turner standard and four-factor analysis discussed therein nevertheless still applied[12] and required the same outcome.  Therefore, the Court concluded that the challenged policy likewise survived that challenge because, again, it is reasonably related to a legitimate penological interest, i.e. maintaining order and security by punishing bad behavior and incentivizing recalcitrant prisoners to improve their behavior.  In fact, the Court noted that the policy is even less subject to challenge on religious grounds, observing:

> If anything, even a stronger case could arguably be made for the policy's reasonableness with respect to the free-exercise claim.  For example, the United States Supreme Court has noted:  "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation."  Turner, 482 U.S. at 90 (citation, quotation marks, and ellipsis omitted).  Here, it must be noted that Christians have been practicing their faith in a variety of ways (such as by engaging in prayer, keeping the Commandments, confessing their sins, performing penance for their transgressions, professing their faith, spreading the Gospel, acting with humility, and abstaining from worldly temptations) for two millennia, long before publications such as the ones at issue in this case even existed.  Where, as here, a policy restricts one aspect of a prisoner's belief system but he retains the ability to participate in other religious observances of his faith, the policy is often considered reasonable.  McAlister v. Livingston, 348 F. App'x 923, 932 (5th Cir. 2009).  Further, the policy at issue in the instant case is content-neutral and prohibits inmates on maximum lockdown from receiving *all* publications, whether religious or secular.  That is likewise an important consideration, because "[w]here a regulation restricts First Amendment rights in a neutral fashion, it is more likely to withstand judicial scrutiny."  Id.

Wright, 2019 WL 7584327, at *6.

---

[11] See Beard, 548 U.S. at 526 (noting that although the prisoners subject to the policy had "no access to newspapers, magazines, or personal photographs," they were "nonetheless permitted legal and personal correspondence, religious and legal materials, two library books, and writing paper"); Tyson, 2010 WL 5375955, at *1 ("[N]o claim related to any deprivation of religious materials is asserted in this case.") and *2 ("I reiterate that no religious exercise claim is encompassed in this lawsuit.").

[12] See DeMarco v. Davis, 914 F.3d 383, 388-89 (5th Cir.), cert. denied, 140 S. Ct. 250 (2019); Butts v. Martin, 877 F.3d 571, 585-86 (5th Cir. 2017).

11

In the instant case, plaintiff's only allegation concerning the policy's impact on his religious practice is that he was prohibited from receiving a publication from Gospel Express Ministries, which the Court notes is a Christian organization.[13]  However, because he does not allege that he is unable to practice his faith in the numerous *other* ways normally employed by Christians, such as those noted in Wright, the same analysis applies here and likewise dooms his challenge to the policy on religious grounds.

Lastly, plaintiff claims that the policy infringes on his Fourteenth Amendment right to equal protection because inmates not confined in administrative segregation are not subject to the restriction.  That claim is plainly meritless.  As the United States Fifth Circuit Court of Appeals has explained:  "To establish an equal protection claim, [a plaintiff] must show that two or more classifications of *similarly situated persons* were treated differently."  Gallegos-Hernandez v. United States, 688 F.3d 190, 195 (5th Cir. 2012) (emphasis added).  Here, plaintiff does not claim that he is treated differently or subjected to harsher conditions than other prisoners who are confined in the segregation unit.  Rather, his complaint is that he is subjected to harsher conditions than inmates with *different prison classifications* and who are housed in *different prison units*.  That comparison, however, is inapposite because, simply put, "inmates with different housing classifications are not similarly situated."  McKinley v. Owens, 456 F. App'x 468, 469 (5th Cir. 2012); accord Fogle v. Pierson, 435 F.3d 1252, 1261 (10th Cir. 2006) (finding that, "by definition," administrative segregation inmates are not similarly situated to general population inmates).

---

[13] See https://www.gospelexpress.com/who-we-are/our-history/.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that plaintiff's complaint be **DISMISSED WITH PREJUDICE** as frivolous and/or for failing to state a claim upon which relief may be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this 30th day of April, 2020.

　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　**JANIS VAN MEERVELD**
　　　　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**